[Crim. No. 472. Fifth Dist. May 6, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. MARY
LAVERNE BROWN, Defendant and Appellant.

624

Allan M. Myerson for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Daniel J. Kremer and Jon A. Shoenberger, Deputy Attorneys General, for Plaintiff and Respondent.

GARGANO, J.—Appellant appeals from a judgment of conviction entered on a jury's verdict. She was convicted of

murder in violation of Penal Code section 187 (count I) and conspiracy to commit murder in violation of Penal Code section 182 (count II). Appellant contends (1) that the evidence was insufficient to justify her conviction on either count, (2) that hearsay testimony was improperly admitted into evidence, and (3) that she was denied a fair trial because several prospective jurors who voiced opposition to the death penalty were automatically excluded by the trial judge.

P. J. Brown was killed by his eldest daughter, Terry Minson, on November 5, 1966, at approximately 12:30 a.m. while he was asleep in the den of his home in Selma, California. The background facts of this bizarre murder, when viewed in the light most favorable to respondent, are essentially these:

In the spring of 1966 appellant offered Clyde Rhodes, a friend of Terry Minson, $2,000 to kill her husband. Rhodes told appellant he would not do it. In the summer of that year appellant made the same offer to her daughter's boy friend, Mike Vance. Vance said he was not interested. A few days later appellant, in the presence of Terry Minson and Eddie Young, again offered Vance $2,000 to kill her husband. This offer was refused by Vance. Then appellant offered Young $2,000 to kill Brown. Young also refused.

Later that day Terry Minson and her two male companions returned to Terry's apartment. After some discussion Vance told Terry that he would kill her father. However, he said he needed some money first. Terry returned to her mother's home and informed her that Vance had agreed to kill Brown but wanted $300 before he would do it. Appellant then cashed two of Brown's disability checks totaling $200 and gave this money and an additional $100 to her daughter. Terry returned to her apartment and delivered the money to Vance.

On September 24, 1966, Mike Vance decided to kill Brown with an 18-inch hari-kari knife; he had purchased the knife with part of the money he had received from appellant. That evening Vance and Young went to Brown's residence where they met appellant. She told them to make some noise so that Brown would come out. However, after Brown came out Vance changed his mind and the two young men left.

The following night Vance decided to make another attempt on Brown's life, this time with a shotgun borrowed from a friend. However, upon reaching the Brown residence Vance again changed his mind. He then returned to Terry Minson's apartment and informed her that he was not going to kill her

father and offered to return the $300. Terry told him not to worry about paying back the money.

After the second attempt to kill her husband failed, appellant became concerned that he would find out about the money she had given Mike Vance. She asked her daughter to tell Vance that if he would kill Brown by November 4, 1966, she would pay him an additional $500 bonus. When Terry gave the message to Vance he purchased a .22 caliber rifle; this rifle was also purchased with part of the money Vance received from appellant. The following day Terry made several inquiries of Vance as to when he was going to do the killing. Later she told him on two separate occasions that the shooting had to be done on November 4 and that she was going to do it.

On the evening of November 4, 1966, Terry Minson drove to her parents' house in Vance's car with the .22 rifle on the back seat. As she walked across the front lawn appellant came to the door and then met her daughter outside. Appellant asked Terry if the shooting was to be done that night, and Terry assured her that it was. Appellant told her daughter she would leave the side door, which opened into the den, unlocked. Then Terry left.

Around midnight Terry again drove Vance's automobile to her parents' home. She parked behind the house, picked up the rifle from the back seat of the car, and walked to the front of the house. There she observed appellant and her father in the den. Brown was asleep on the couch facing the side door. Terry went to the back of the house and from there to the side where she opened the unlocked door. When appellant heard her daughter at the door, she went over and told her not to open it too far lest her father see her, should he awaken. As Terry was aiming the gun appellant asked her if she would be able to do it, and if she wanted to be left alone. Terry told appellant to leave, reaimed the gun at her father and shot him.

The following morning appellant met Terry Minson and Mike Vance at Terry's apartment. She told them that she had been questioned by the police and that she hoped Terry would not be caught. She also gave Vance some money to get rid of the car and the murder weapon. However, when the police officers arrived at Terry's apartment Vance's car was still in front, and the .22 caliber rifle was on the rear seat. The rifle was taken with Vance's permission, and ballistics tests proved it to be the murder weapon.

At the trial appellant testified that her marriage had been stormy and that she had filed for divorce three times. She admitted making threats against her husband but denied that they were intended to be taken seriously. She also admitted that she may have discussed ways of getting rid of Brown but asserted that she was not serious. Appellant denied that she had ever offered anyone money to kill her husband, and stated that she did not aid her daughter in the murder.

1) Appellant's bold assertion that the evidence was insufficient to justify her conviction on the murder count, when viewed in light of the combined testimony of Terry Minson, Mike Vance and Eddie Young, is so lacking in merit that it is hardly worth mentioning. In fact, respondent's evidence that appellant was the instigator of her husband's murder, and then aided and abetted her daughter in the commission of the patricide is not only substantial but overpowering.

It is the rule that before a jury verdict can be set aside for insufficient evidence, it must clearly "appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below." (*People* v. *Tom Woo,* 181 Cal. 315, 326 [184 P. 389] ; *People* v. *Newland,* 15 Cal.2d 678 [104 P.2d 778].) Moreover, the test for determining whether an accused can be held as an aider and abetter is whether he in any way, directly or indirectly, aided in the perpetration of the crime by words or gestures (*People* v. *Masters,* 219 Cal.App.2d 672 [33 Cal. Rptr. 383] ).

Appellant's secondary contention that the evidence was also insufficient to justify her conviction of conspiracy to commit murder is apparently based on the argument that the murder was committed by Terry Minson, and that there was no express agreement to kill Brown between appellant and her daughter. However, there was ample evidence of such an agreement between appellant and Mike Vance, and this agreement was alone sufficient to justify appellant's conviction of the crime charged in count II. Appellant twice offered Vance $2,000 to kill her husband, and when he finally accepted she paid him $300 in advance. This money was used by Vance to purchase a hari-kari knife and a .22 rifle which he used in two abortive attempts on Brown's life. It is the rule that a criminal conspiracy exists when two or more persons agree to commit a crime and do some overt act in furtherance of the agreement (*People* v. *Cockrell,* 63 Cal.2d 659 [47 Cal.Rptr.

788, 408 P.2d 116]; *People* v. *Van Eyk,* 56 Cal.2d 471 [15 Cal.Rptr. 150, 364 P.2d 326]).

▆ In any event, there was also sufficient evidence to connect appellant's daughter with the conspiracy. The three persons solicited by appellant to kill her husband were all friends of Terry Minson. In addition, Terry was present when the $2,000 offer was made to Mike Vance and then apparently persuaded Vance to accept the offer. It was Terry Minson who told appellant that Vance had accepted her offer and then brought Vance the money he said he needed. Finally, on the evening of the murder Terry told her mother she was going to do the killing, and appellant answered that she would leave the side door open. Significantly, the fatal shot was fired through the doorway that appellant left unlocked. ▆ It is settled that to prove a criminal conspiracy it need not be shown that the parties met and actually agreed to jointly undertake criminal action. On the contrary, a criminal conspiracy may be shown by direct or circumstantial evidence that the parties positively or tacitly came to a mutual understanding to accomplish the act and unlawful design (*People* v. *Calhoun,* 50 Cal.2d 137 [323 P.2d 427]).

▆ 2) Appellant's sole complaint in support of her second main contention that the court improperly allowed hearsay evidence is that the court admitted conversations between appellant, Mike Vance and Terry Minson before respondent established by independent evidence the corpus delecti of the conspiracy to kill Brown. She asserts that ''before evidence of the acts and declarations of an alleged coconspirator is admissible against the other, the facts of the conspiracy must be proved.'' (*People* v. *Steccone,* 36 Cal.2d 234, 238 [223 P.2d 17]; *People* v. *Calhoun, supra,* 50 Cal.2d 137.)

The conversations to which appellant refers fall into two separate categories. In the first category are conversations in which appellant attempted to induce her daughter's boy friend to kill her husband, and conversations between Terry Minson and Mike Vance in which Terry ultimately persuaded Mike to accept her mother's criminal offer. As to these conversations, it is absolutely clear that they were not objectionable hearsay. They were admissible to prove appellant's criminal intent and to establish the criminal agreement (*People* v. *Curtis,* 106 Cal.App.2d 321 [235 P.2d 51]; *People* v. *Collier,* 111 Cal.App. 215 [295 P. 898]).

In the second category are conversations between Terry Minson and Mike Vance in furtherance of the criminal con-

spiracy. As to these conversations, there was ample evidence of the existence of a criminal conspiracy, and it is immaterial as to whether they were admitted before or after the conspiracy was established. In short, the order of proof is immaterial as long as the conspiracy is ultimately proved (*People* v. *Curtis, supra,* 106 Cal.App.2d 321).

In any event, with one exception, appellant's trial counsel did not object to the hearsay character of the challenged testimony.[1] In fact, some of the testimony to which appellant now objects was elicited by her own trial counsel. It is elementary that hearsay is competent evidence unless objected to in the trial court, and that the hearsay objection may not be raised for the first time on appeal (*People* v. *Huber,* 225 Cal.App.2d 536 [37 Cal.Rptr. 512]).

3) While conceding that this is not a death penalty case, appellant nevertheless relies on *Witherspoon* v. *Illinois,* 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], and alleges that she was not given a fair trial because jurors who had conscientious scruples against the imposition of the death penalty were automatically excluded by the court. The thrust of her argument is that jurors not opposed to the death penalty tend to favor the prosecution on the guilt phase of the trial, and that the trial judge ''stacked the deck'' against her. However, an essentially similar argument was rejected by the California Supreme Court, and no further comment in this opinion is necessary (*In re Anderson,* 69 Cal.2d 613 [73 Cal.Rptr. 21, 447 P.2d 117]).

The judgment is affirmed.

Conley, P. J., and Stone, J., concurred.

---

[1]Appellant's trial counsel made only one objection to the hearsay character of the testimony to which appellant objects in this appeal; he objected to the testimony of Detective Christensen relating to the investigation which the detective made. However, after a colloquy between the court and counsel, this objection was withdrawn.