[Crim. No. 6207. Third Dist. Jan. 17, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM CY HENRY, Defendant and Appellant.

## COUNSEL

Jon P. Beaver, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Daniel J. Kremer and Loren E. McMaster, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**PIERCE, J.**\*—Defendant Henry appeals from a judgment following a jury conviction for possession of marijuana (violation of Health & Saf. Code, § 11530.) This was a second trial; at the first trial the jury was unable to reach a verdict.

---

\*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

A warrantless search of defendant's room was legally made, but failure of the trial court to give a cautionary instruction *sua sponte* affecting the manner in which the jury must regard an admission admitted into evidence will require a reversal. Thus, we do not reach the question of *Miranda* rights. (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].)

At the time of the alleged commission of the present offense defendant was on probation. One of the conditions of probation was, to quote a stipulation of the parties, that "the entry by Officer Horton and search conducted by him of the Henry residence was pursuant to a valid condition of probation as imposed by the Chico Municipal Court that Mr. Henry [defendant] consent to a search of his person or property at any time." This was a condition of probation exacted without violation of defendant's constitutional rights. (*People* v. *Mason* (1971) 5 Cal.3d 759 [97 Cal.Rptr. 302, 488 P.2d 630].)

## FACTS

The testimony of the prosecution consisted of two witnesses, a Chico police officer, Robert Horton, who testified to the search of defendant's bedroom at 924 Pine Street, Chico, and to certain admissions assertedly made by defendant, and Kenneth McLean, a drug abuse chemist for the State Bureau of Narcotic Enforcement, whose testimony proved that the substance found in defendant's bedroom (as hereinafter mentioned) was marijuana seed. That fact was not disputed.

The arrest involved here occurred on Sunday, May 31, 1970. Before describing the events causing the arrest, we set the stage. Defendant's room was in one of a number of cabins (cabin 3) of a multicabin complex occupied apparently mostly by former or present students of Chico State College. It was single storied, "barrack"-like and with very thin walls.

Defendant's was a two-bedroom cabin, with living room, kitchen and bathroom. Defendant shared the cabin with another man not involved in this prosecution—Ray Brown. Defendant's bedroom was very small, sparsely furnished with a cot and clothes hanger containing the clothing to be mentioned below. There is no conflict and extensive corroboration to defendant's testimony that on Thursday, May 28th, he and a friend, Jim Wilkinson (a defense witness), had gone on a camping trip to Whiskey Flat, driving there in defendant's automobile, and that they did not return to the cabin until the late afternoon or early evening of Sunday, May 31st. There is also no conflict, and substantial evidence to corroborate

the fact that while defendant was away his cabin was occupied by a friend named Irvin Stout and the latter's girl friend, June.[1]

When defendant and Wilkinson returned from their camping trip and reached Chico, defendant took the latter to his home, then drove over to the dormitory room of his girl friend, Sally McCracken. Both he and she testified that there he took a shower, after which the two went out to dinner. Following dinner they had proposed to visit defendant's mother but detoured by way of his cabin so defendant might leave off his camping equipment. When he did so, he noticed that the Stout camping gear was still at his place and that Stout and his girl friend June were among a number of friends and acquaintances, occupants of the cabins and others still around the place. The two stopped to talk with these people. It was at this point that Officer Horton drove up. With him was what loosely might be described a phalanx of other officers—although, according to Horton, the sole purpose of the visit was to make a check of defendant's room.

The following is Officer Horton's version of what occurred thereafter. (There is nothing in the record that shows, or from which we can infer, why Officer Horton had so many riders.) Horton asked for defendant who immediately identified himself and at the officer's request escorted him to his room in the cabin. There were present in the cabin two or more persons lounging in the living room. The officer asked them to leave. Some of the other officers fanned out around the cabin. Two officers, Leonard Inch and an unidentified probation officer, accompanied Horton to defendant's room. Horton either asked defendant if he could search his room or told him he was going to search it. In either event, defendant consented readily. Officer Horton testified that defendant made no furtive or suspicious movements. The officer described him as being completely cooperative. In fact, defendant and the probation officer, both standing at the doorway, were engaged in casual conversation while the search was going on.

Officer Horton noticed the two camping packs and a suitcase in the room while he was making his search.

The search commenced at the clothes rack. Present there he described

---

[1]Evidence to that effect is: testimony by defendant that he had offered Stout the use of his room upon the return of the latter and the girl from a camping trip of their own. Testimony of the tenant of cabin 2 that Stout and the girl occupied defendant's room from Thursday on, and that he (the tenant) had had dinner with Stout and June on Thursday night; the fact that a woman's purse with a card marked "Irvin Stout" had been found in the kitchen by the police. Also the Stout camping equipment was found on the floor of the cabin (in addition to that of defendant) and both Stout and June were among those still in front of the cabin when defendant returned.

five or six shirts, three or four jackets and two pair of pants. He ran his hands over the jackets and felt a "lump." This caused him to reach into an inside breast pocket from which he removed two plastic bags, one within the other. The outside plastic bag was a heavier material and contained a snap. The inner plastic bag contained brownish green seed material, later identified by the expert (the only other prosecution witness called) as containing marijuana seed, part of which was fertile.

On direct examination Officer Horton stated positively that as soon as he had seen the seed he directed Officer Inch to arrest defendant, that defendant then came forward and asked Horton: "What did you find"; that he Horton, replied: "A bag of what appears to be marijuana seed"; that defendant denied it was his by saying something like "Wow"; that Horton then said: "The jacket is yours, isn't it?" and that defendant had said that it was.

Officer Horton first testified that the foregoing occurrences had been at 1 p.m. After a recess he took the stand again at his own request. He said that during the recess he had read the report written by him substantially concurrent with the happening of the incident nine months before his testimony in order to compare the two. He had read the report in its entirety. From that report he was reminded that the time was 8 p.m.

Cross-examination brought out other differences between the officer's testimony and the material contained in the report. The latter contained nothing about defendant having admitted that the jacket was his. Horton also stated (on cross-examination) that defendant had seemed surprised at what Horton had found.[2]

■ It was brought out on cross-examination that a woman's purse with an identifying California driver's license bearing the name "Irvin Stout" in it as well as marijuana was found in the kitchen of the cabin.

We will mention the marked differences between the testimony of the defense and that of Officer Horton.[3] According to defendant the occurrences in the cabin materially varied from the testimony relating to those happenings as stated by Horton. Defendant stated that Officer Horton had

---

[2]The jacket was never produced in the courtroom.

[3]We have stated at the outset of this opinion that we find substantial error in this record. That being so, it is no longer our obligation to consider the evidence, with all its inferences, in the light most favorable to respondent (i.e., the "substantial evidence" rule). (*Crawford* v. *Southern Pac. Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].) On the contrary, where substantial error is found it becomes an appellate court's duty to review the entire record, weighing to some extent conflicting evidence, to determine whether there has been a miscarriage of justice requiring reversal. (*Alarid* v. *Vanier* (1958) 50 Cal.2d 617, 625 [327 P.2d 897].)

asked him nothing about whether the articles of clothing on the clothing rack belonged to him. Horton told him that he was under arrest, and then showed him the jacket and the packet. He informed the officer that neither article was his. His testimony: "Q. [W]as anything shown to you by Officer Horton? A. Yes, sir. Q. And what was that? A. Two things. A jacket. . . . A. And that package. Q. Did he ask you any questions? A. Yes, sir. Q. And what did he ask you? A. He asked me if either one of them was mine. Q. And what did you respond? A. No, sir. . . . A. . . . I believe he held the coat up first . . . or pointed to it. And then he said 'Is this yours'?' And I said 'No.' Q. And then he said [apparently indicating the package] 'Is this yours'? A. And I said 'No, what is it.' "

At that time he had already been placed under arrest and handcuffed.

If the testimony of Alfred Karger, a cotenant of the cabins (his cabin adjoined that of defendant and Brown) is to be credited—and it was corroborated by the circumstantial evidence related below—Irvin Stout and his girl, June, must actually have occupied the bedroom of the Brown-defendant cabin during the period from the return from their own camping trip until the time of the arrest of defendant. He, Karger, was invited to and did join them for dinner there late in the week. Karger saw them come and go. The walls separating defendant's bedroom from Karger's apartment were very thin, and he heard them talking frequently during the period of their stay. Defendant testified that he had given them permission to stay in his apartment while he was away. Two "sets" of camping equipment were on the floor of the cabin when the police arrived. A woman's purse, obviously identified with Stout, with traces of marijuana in it, was found in the kitchen. There was evidence that Stout was on the premises when the officer made his search. He was never asked whether the jacket was his. In fact, he was not questioned at all.

FAILURE BY THE JUDGE TO INSTRUCT SUA SPONTE THAT EVIDENCE OF AN ORAL ADMISSION OF THE DEFENDANT OUGHT TO BE VIEWED WITH CAUTION WAS PREJUDICIAL ERROR.

A common instruction (embodied in CALJIC No. 2.71) was neither requested by defendant nor given: "A statement made by a defendant other than at his trial may be an admission.

"An admission is a statement by a defendant, which by itself is not sufficient to warrant an inference of guilt, but which tends to prove guilt when considered with the rest of the evidence.

"You are the exclusive judges as to whether an admission was made by the defendant and if the statement is true in whole or in part. If you should find that such statement is entirely untrue, you must reject it. If you find it is true in part, you may consider that part which you find to be true.

*"Evidence of an oral admission of the defendant ought to be viewed with caution."* (Italics ours.)

The rule is well settled that the court, when requested to do so by defendant, must instruct correctly on any pertinent matter. (Pen. Code, § 1093, subd. 6.) The question to be answered in this case is must the trial court, absent the request of defense counsel therefor, instruct *sua sponte* when the instruction involved is a cautionary instruction worded as we have pointed out above? Mr. Witkin gives to this question a "limited yes." (See Witkin, Cal. Criminal Procedure (1963) Trial, § 477, p. 484.) That limitation is that *sua sponte* instructions are only necessary if they are on general principles of law pertinent to the case, "necessary for the jury's understanding of the case; he need not instruct, without request, on specific points or special theories which might be applicable to the particular case. [Citations.]" (*Id.* § 472, p. 478.)

An opinion of this court, *People* v. *Crawford* (1968) 259 Cal.App.2d 874 [66 Cal.Rptr. 527], although it did not involve a "cautionary instruction" did, we think, rather succinctly differentiate between the cases requiring *sua sponte* instruction and those not so requiring. The court stated on page 877: "The demarcation between trials demanding an instruction *sua sponte* and those interposing a defense request as a precondition is drawn in *People* v. *Wade* (1959) 53 Cal.2d 322, 334 [1 Cal.Rptr. 683, 348 P.2d 116]: '. . . In determining what instructions a trial court is required to give without request, the rule is usually stated to be that the court has a duty to give instructions on the general principles of law governing the case, even though not requested by the parties, but it need not instruct on specific points developed at the trial unless requested.

" 'The rule seems undoubtedly designed to promote the ends of justice by providing some judicial safeguards for defendants from the possible vagaries of ineptness of counsel under the adversary system. Yet the trial court cannot be required to anticipate every possible theory that may fit the facts of the case before it and instruct the jury accordingly. The judge need not fill in every time a litigant or his counsel fails to discover an abstruse but possible theory of the facts.

" 'The most rational interpretation of the phrase "general principles of

law governing the case" would seem to be as those principles of law commonly or closely and openly connected with the facts of the case before the court.' " It is stated in CALJIC (3d ed.) Appendix A, page 573: "Certain cautionary instructions on evidence and witnesses in former Code Civ. Proc., § 2061 are probably still mandatory. See Law Revision Commission Comment to repeal of Section 2061 and Witkin, Calif. Evid. (2d ed.), § 1108."

Dean Wigmore (7 Wigmore, Evidence (3d ed. 1940) § 2094, pp. 468-469) refers to the admissibility of oral admissions as something approaching a necessary evil, saying (at p. 468) "[a] contrary rule would no doubt be unendurable, and the risk of error must be incurred in preference to the certainty of hardship which would otherwise ensue." But the eminent scholar hastens to add: "Nevertheless, the great possibilities of error in trusting to recollection-testimony of oral utterances, supposed to have been heard, have never been ignored; but an antidote is constantly given by an instruction to the jury against trusting overmuch to the accuracy of such testimony."

We have read the record, relevant portions of which have been outlined above. The jury, notwithstanding the failure of the trial court to give the cautionary instruction that admissions ought to be received with caution, might have believed Officer Horton. Or, as had the jury at the previous trial, it might have disagreed. Or, it might have acquitted this defendant. We consider the elements which lead us to the last two possible results:

(1) The jury could have questioned why Officer Horton's testimony regarding defendant's admission that the jacket was his was not corroborated by either of the other two officers who had been present and who must have overheard the conversation.

(2) The jacket, the ownership of which was sharply disputed, was not produced, and its absence was not explained. If produced, it could have been tried on defendant to see whether it fit. (It will be remembered defendant had been tried before, had denied an admission of ownership of the jacket and the fact of ownership. The prosecution had not been surprised.)

(3) The jury could have as readily believed that the jacket belonged to Irvin Stout and that the heavy plastic bag with the snap had come from the lady's handbag; or it could have believed the jacket belonged to either of the two persons who were lounging in the living room, or that it belonged to defendant. If told that the asserted admission regarding the

jacket ought to be viewed with caution, it could have more actively wondered why the admission was not mentioned in Officer Horton's report. The admission had it been made was one of the two most important facts in the case. Officers usually report important facts. Why was this not mentioned?

(5) Other marijuana was found in the Irvin Stout handbag; none was found in or about defendant's room. Why were neither Stout nor his girl sought?

(6) Why were none of the occupants or persons present at the cabins questioned?

(7) The jury could, if cautioned, have wondered why the officer had disremembered the time of search and arrest by as much as seven hours. We think Professor Wigmore would have felt that a jury should have been cautioned against a memory that weak.

The court makes these suggestions of possibilities, leading to a verdict of not guilty, not as a suggestion that innocence was proven. We make them to establish why we deem this not to be an open-and-shut case, why we believe that there is a reasonable probability that a jury could have reached a result more favorable to defendant than conviction, and why we hold that the cautionary instruction omitted was not only error, but that the error was prejudicial.

The foregoing decision makes it unnecessary to discuss at length the issue of the failure of the record to show that a police officer gave the *Miranda* warning. Although the record is not entirely clear it appears in a discussion in chambers that one may have been given, offer of proof of which was omitted.

When the disputed extrajudicial admissions were made, defendant had already been arrested. No attorney was then present representing defendant. But not all discussions between an accused and an officer (after arrest) are "interrogations."

Assuming that this case is destined to be retried and assuming moreover that the evidence at the third trial is the same as it was at the second, a close question—one as to which courts might reasonably differ—may exist as to whether the investigative process had passed and the interrogative period had begun; if the latter, whether the alleged statements had been volunteered or had been solicited by the officer.

The offer of proof should be examined. *Miranda* v. *Arizona, supra,* 384 U.S. 436; *People* v. *Superior Court* (1970) 3 Cal.App.3d 476 [83 Cal.Rptr. 771], and prior cases therein cited should be read.

The holding of this court shall not be construed as a ruling by this court one way or the other on the matter.

Judgment is reversed.

Richardson, P. J., and Janes, J., concurred.