Filed 5/21/13  P. v. Rucker CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B237359 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA070942) |
| v. | |
| DARRELL RUCKER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Jesse I. Rodriguez, Judge.  Affirmed in part.

Alex Coolman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Blythe J. Leszkay, Brendan Sullivan and Carl N. Henry, Deputy Attorneys General, for Plaintiff and Respondent.

————————————————

Darrell Rucker, Sr. was convicted of voluntary manslaughter for killing Malcolm Youngblood. He appeals his conviction and sentence, arguing that the jury was improperly instructed and that the trial court erred in finding that he had suffered a prior juvenile adjudication. He also seeks review of the court's ruling in response to his request to discover personnel records of various police officers. We find that there was insufficient evidence to support the court's finding that he had suffered a prior juvenile adjudication but otherwise affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Darrell Rucker, Sr. shot and killed his nephew Malcolm Youngblood on July 10, 2006. He was tried and convicted of murder. In 2009, this court reversed the murder conviction on the grounds that the trial court had conducted proceedings before the jury that should have occurred outside the jury's presence, during which the jury was exposed to statements that would have led a reasonable juror to believe that the court believed the defendant was a liar attempting to manipulate the proceedings. (*People v. Rucker* (Dec. 15, 2009, B203503) [nonpub. opn.].)

The matter was retried before a new judge. The bulk of the evidence against Rucker came from police interviews of his son, Darrell Rucker, Jr. (known as "Junior"). Junior witnessed the shooting and spoke with the police that day, giving both recorded and unrecorded statements. Rucker also testified, and a police interview he gave shortly after the crime was played for the jury.

The prosecution presented evidence that Rucker shot Youngblood multiple times without provocation after Youngblood complained about a malfunctioning car that Rucker had sold him. Rucker claimed that he acted in self-defense and to defend his son: that Youngblood had threatened him and a mechanic friend days before the shooting, and that on the morning of the shooting Youngblood threatened him again, leading to a moment when Rucker believed Youngblood was holding or was reaching for a weapon to shoot Rucker and Junior. The jury was instructed on first degree murder, second degree

2

murder, manslaughter (heat of passion and imperfect self-defense), and justifiable homicide in self-defense or defense of another.  The jury convicted Rucker of voluntary manslaughter.  Rucker appeals.

## DISCUSSION

### I.        CALCRIM No. 505

Rucker contends that the trial court erred when it gave CALCRIM No. 505, the instruction on justifiable homicide in self defense or defense of another, without bracketed language in the instruction concerning threats to the defendants from others reasonably associated with the decedent.  Rucker contends that the trial court should have included this language:  "If you find that the defendant received a threat from someone else that he reasonably associated with Youngblood, you may consider that threat in deciding whether the defendant was justified in acting in self-defense."

The court was the first to raise the question of which, if any, of the various bracketed passages in CALCRIM No. 505 was appropriate here.  The court specifically noted, "I have a question mark as to" the language about threats from someone associated with the victim, and said, "I'll stand to be corrected, but I can't find it in my notes or in my mind that evidence has been presented."  Defense counsel spoke with Rucker, asked to come back to the issue later, and then said, "I can't think of anything at this moment right now.  If I do, I'll let the court know."  The court said, "I'll leave that one in abeyance here just in case."

Later, the court reminded counsel, "505 I'm going to give, but we had not talked about the other two paragraphs.  We were waiting, Mr. Na [defense counsel], to decide on the paragraph, if you found that the defendant received a threat from someone else that he reasonably associated it with Malcolm Youngblood."  Defense counsel responded, "If the court considers the possible—the shootout issue that was made in the defendant's taped statement.  Otherwise, I submit."  The court said, "No, I do not," and gave the instruction without the additional bracketed language.

3

Rucker argues this was error because the court edited CALCRIM No. 505 "in a legally incorrect manner," and contends that antecedent threats are a general principle of law upon which the court was required to instruct the jury.[1] This argument is contrary to the law, and the instruction as given was legally correct. A trial court must instruct the jury concerning antecedent threats and/or assaults only when the instruction is specifically requested: "The trial court was obligated to instruct on the basic principles of self-defense. It satisfied this duty by giving the standard . . . instructions on this topic. These instructions are legally correct and the concept of antecedent assaults is fully consistent with the general principles that are addressed therein. [Citation.] The issue of the effect of antecedent assaults against defendant on the reasonableness of defendant's timing and degree of force highlights a particular aspect of this defense and relates to a particular piece of evidence. An instruction on the topic of antecedent assaults is analogous to a clarifying instruction. It is axiomatic that '[a] defendant who believes that an instruction requires clarification must request it.' [Citation.] Therefore, we conclude that this is a 'specific point' and is not a general principle of law; the trial court was not obligated to instruct on this issue absent request." (*People v. Garvin* (2003) 110 Cal.App.4th 484, 489 [CALJIC instructions given].)

As the Supreme Court has written, "[I]f defendant believed the instructions required clarification or modification, it was incumbent upon him to request it." (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1140.) Here, counsel never requested that this language be included in the jury instruction. Instead, the court repeatedly asked whether defense counsel believed the evidence merited the inclusion of the optional language. Counsel first stated that he knew of no evidentiary basis for the language; then, when the court later invited comment once more, Rucker's counsel mentioned some evidence in the defendant's police interview but left the determination to the court's discretion.

---

[1] Rucker cites *People v. Minifee* (1996) 13 Cal.4th 1055, at page 1060, to support his claim that "[w]here self-defense is at issue, the jury must be instructed that it may consider threats by individuals reasonably associated with the victim," but *Minifee* concerns the admissibility of third-party threats, not jury instructions. (*Ibid*.)

Counsel neither objected nor argued further when the court said it did not think that the evidence mentioned supported the inclusion of the bracketed language in the instruction. As counsel neither requested the clarifying language nor made an argument from which a request for this language could be implied, the trial court was not obligated to include the bracketed language in CALCRIM No. 505.

## II.    CALCRIM No. 358

CALCRIM No. 358 concerns evidence of out-of-court statements of the defendant, and it advises the jury that it is required to decide whether the defendant made the offered statements. If the jury believes that the defendant made the statements, the jury is instructed to consider those statements with the other evidence in reaching a verdict. (CALCRIM No. 358.) CALCRIM No. 358 also includes bracketed language: "Consider with caution any statement made by (the/a) defendant tending to show (his/her) guilt unless the statement was written or otherwise recorded." Although the trial court ordinarily has a sua sponte duty to give the bracketed language when there is evidence of an incriminating out-of-court oral statement made by the defendant, the bracketed language is not necessary if the defendant's incriminating statements are recorded and the recording is played for the jury. (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1200.)

Here, the trial court advised the parties that it would not give the bracketed language: "The last paragraph I'm going to delete because this was tape[] recorded." Rucker contends that this was error because the jury heard a considerable amount of evidence from Junior concerning unrecorded inculpatory remarks made by Rucker before, during, and after the shooting, and a review of the record confirms that Junior's account of events to the police contained multiple inculpatory statements attributed to his father. Specifically, Rucker focuses on four unrecorded statements related by Junior: Rucker telling Junior the morning of the shooting, while showing him the gun, that he could "take care" of any problems that Junior had arising from an argument with another

person; Rucker screaming, "You demon," while shooting Youngblood; Rucker telling Junior after the shooting that he "had to get rid" of Youngblood because "I'm tired of him threatening me," and Rucker telling Junior after the shooting not to tell anyone about it, that he was never at the scene, and that he would take Junior out for lunch later.

While some portion of Junior's interview was recorded, as the Attorney General notes, it was Junior's account of his father's prior statements that was recorded, not the underlying utterances by Rucker. That Junior was recorded as he asserted that his father had made specific statements does not relieve the trial court of the responsibility of giving the cautionary language—this language is necessary because of "the inability of a person to repeat exactly the words of another person." (*People v. Gardner* (1961) 195 Cal.App.2d 829, 832.) The instruction must be given unless the defendant made the statement in writing or it was "introduced in evidence by means of a tape recording of defendant's own voice." (*Ibid*.) As the jury heard evidence of statements made by Rucker that tended to show his guilt that had not been contemporaneously recorded or written, the trial court had a sua sponte duty to give the bracketed language.

The failure to give this language in the instruction requires reversal only if it is reasonably probable that the jury would have reached a result more favorable to the defendant had the instruction been given. (*People v. Carpenter* (1997) 15 Cal.4th 312, 393, superseded on other grounds by statute as recognized in *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1106-1107.) Rucker argues that it is reasonably probable that the jury would have reached a more favorable result had the instructional language been given because the statements attributed to Rucker by Junior were the most powerful evidence of Rucker's state of mind at and near the time of the shooting.

Rucker has not established that he was prejudiced. All of the statements appeared to be related to the intent elements of the charged crimes. Rucker, however, was acquitted of the first and second degree murder charges, and convicted only of voluntary manslaughter. Based on the jury instructions, the jury may have concluded that he committed manslaughter based on heat of passion, imperfect self-defense, or imperfect defense of others. For him to have been prejudiced by the failure to include the bracketed

6

portion of the instruction, therefore, the unrecorded statements could only pertain to the choice between manslaughter and justifiable homicide. These comments do not do so. As Rucker notes, his statement to Junior that he "had to get rid" of Youngblood because "I'm tired of him threatening me," tended to prove that Rucker had carried out the shooting in a calculated way simply because he was tired of Youngblood threatening him. The jury, however, rejected the theory that Rucker calculatedly shot Youngblood when it convicted Rucker of manslaughter rather than murder: the jury's verdict demonstrates that it found either that Rucker killed Youngblood in the heat of passion or in the actual but unreasonable belief that he needed to defend himself or another. Rucker has not explained, nor can we identify, any respect in which this statement could have led the jury to convict him of manslaughter rather than reaching the more favorable conclusion that the homicide was justified by self-defense or the need to defend others.

The same is true for Rucker's post-shooting statement to his son that his son had never been there and that they would meet later. Rucker contends that these statements "suggested an awareness of guilt, a callousness, and a degree of calculation" that was inconsistent with self-defense, but a father's attempt to keep his teenage son out of the aftermath of a shooting and his plan to see him later in the day do not tend to demonstrate anything about whether Rucker had acted out of a reasonable need to defend himself, and they do not tend to demonstrate that Rucker's actual belief in the need to defend himself was unreasonable.

With respect to Rucker's statement to Junior the morning of the shooting that he could "take care" of any of Junior's problems, made while holding the handgun he later used to kill Youngblood, Rucker contends that this statement suggested that he would be quick to resort to the use of deadly force whether or not he had a reasonable belief in the need for such force. If the jury based its manslaughter verdict on heat of passion, then the jury necessarily found that Rucker was provoked in such a manner that would have caused a person of average disposition to act rashly and without due deliberation, and thus whether he might have a tendency to resort to force was irrelevant given that his use of force was objectively reasonable. If the jury based its manslaughter verdict on

7

imperfect self-defense/defense of others as opposed to heat of passion, then the jury necessarily found that the conditions set forth in CALCRIM No. 571 were present here: that Rucker "actually believed that [he] was in imminent danger of being killed or suffering great bodily injury," and that he "actually believed that the immediate use of deadly force was necessary to defend against the imminent danger." Rucker's tendency to resort to force does not tend to demonstrate anything about the reasonableness of his belief later that morning that he or Junior was in imminent danger of being killed, or his belief that the immediate use of deadly force was necessary to defend against the danger. The reasonableness of Rucker's beliefs pertains to the circumstances rather than to his tendencies. Accordingly, this statement was not reasonably likely to have prompted the jury to conclude that Rucker's belief that the use of deadly force was necessary, or his belief that he or his son was in imminent danger of death, was unreasonable rather than reasonable, and he has not been prejudiced by the error here.[2]

Finally, Rucker argues that he was prejudiced because the prosecutor relied on the unrecorded statements in her closing argument as "trustworthy" and sufficient to convict and because she used those statements to present the shooting as "the product of a mind that was incredibly callous." The prosecutor relied on those statements and other evidence as proof of malice, premeditation, and deliberation and used Junior's statement to urge the jury to convict Rucker of first degree murder. The jury, however, acquitted Rucker of first and second degree murder, demonstrating that it either disregarded Rucker's statements that would have supported the mental state necessary for a murder conviction or that it considered the statements with the caution that the omitted language would have instructed the jury to do. Rucker has not demonstrated that he was prejudiced by the failure to give the full text of CALCRIM No. 358.

---

[2]     Rucker does not make any argument as to why he was prejudiced by the introduction of the evidence that he shouted, "You demon," as he shot Youngblood. This utterance is entirely consistent with justifiable homicide or manslaughter and we identify no prejudice from the admission of this statement without the cautionary language of CALCRIM No. 358.

8

### III. Response to Jury Question

During deliberations, the jury sent out a note to the court that stated, "The jury knows the burden of proof is on the prosecutor. However, [i]f the defendant makes a claim or allegation, does the defendant have to prove his claim/allegation true—or—does prosecutor must prove [*sic*] that the defendant's claim/allegation is false?"

The court and counsel conferred extensively about the appropriate response to the jury's question. Defense counsel wished the jury to be directed to the instructions addressing the burden of proof. The court found the jury's question problematic: "I don't know what claim that they are talking about. This could be ad infinitum. It could be anything that the defendant said in his testimony. It could be anything he said on the tape. I don't believe that I have to pinpoint that. They already know. They begin with the premise[,] 'The jury knows the burden of proof is on the prosecution.' 'If the defendant makes a claim'—what claim? What claim? Is it a claim that there were people knocking on the door, and I was afraid even before I shot Mr. Youngblood; that there were other gang members ready to come in here and kill me? What claim? Is it a claim that he had the gun when his son says he didn't have a gun, and he didn't see the gun, but he believes or perceived that he had a gun? I don't know what claim it is. The claims are from here to China upside down."

Defense counsel suggested directing the jurors to the burden of proof language in CALCRIM Nos. 505, 570, and 571, but the court responded, "[W]hen I look at 'claim/allegation,' what allegation is that? We got 12 jurors in there. They're not telling me is it the claim of self-defense, the claim of imperfect self-defense, is it the claim of emotions, heat of passion or an allegation? You know, there are so many things in this case in terms of what the defense is proposing—not the defense per se, but the statements of Mr. Rucker on the stand that I cannot—I don't think I could be able to pinpoint." Ultimately, the court concluded, "I am going to tell them that I refer them to the instructions given to you by the court, read to you, and that's it." Defense counsel began to argue further, but the court interjected, "I understand your pain. I understand your

9

request, Mr. Na [defense counsel]. But I think I shouldn't pinpoint any instruction because you have to look at the instructions in the totality of the circumstances in light of this request." The court advised the jury, "I refer you to the Court's instructions read to you and provided to you."

On appeal, Rucker contends that the court abused its discretion because it "provided no assistance to the jury in dealing with the most critical legal concept in the trial despite the confusing nature of the law and the obvious risk that the jury would assign an unfair burden to [Rucker]." He further contends that the error deprived him of his rights to due process and a jury trial because it permitted the jury to convict him without the prosecution proving each element of the offense beyond a reasonable doubt.

The trial court has a primary duty to help the jury understand the legal principles it is asked to apply. (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.) When a jury inquires further during deliberations, elaborating on the standard instructions is not always necessary: "Where the original instructions are themselves full and complete, the court has discretion under [Penal Code] section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information." (*Ibid*.) The court must consider how it can best aid the jury, and "decide as to each jury question whether further explanation is desirable, or whether it should merely reiterate the instructions already given." (*Ibid*.)

Rucker has not demonstrated any abuse of discretion here. The trial court fully considered the jury's question, pondered what the question said and what the question's terms revealed about the precise area of difficulty for the jury, and it also consulted extensively with counsel about the best response. The court concluded that a pinpoint instruction was not appropriate because the jury's question did not specify which particular or claim it was considering, and that a general reference back to the instructions as a whole, with their multiple statements of the burden of proof, was the best way to respond to the jury's question. This was reasonable, as the jury had been properly instructed on the burden of proof in general and as it related to each theory of homicide presented to the jury: CALCRIM No. 220 stated the general burden of proof

10

and the presumption of innocence. CALCRIM No. 570 instructed the jury that the prosecution had the burden of proving beyond a reasonable doubt that the defendant did not kill as a result of a sudden quarrel or heat of passion. CALCRIM No. 571 stated that the prosecution had the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect self-defense or imperfect defense of others. CALCRIM No. 505 told the jury that the prosecution had the burden of proving beyond a reasonable doubt that the killing was not justified. The court did not misdirect the jury or fail to provide a responsive answer to the inquiry.

Rucker's contentions of constitutional and state law error in the court's response all rest on the premise that the jury's question demonstrated that the jury misunderstood the burden of proof and the speculation that this presumed misunderstanding may have meant that the jury believed Rucker had to prove the reasonableness of his use of self-defense or prove that his mental state justified a manslaughter verdict. He claims that the court "did nothing to dispel this confusion and thereby implicitly endorsed the jury's misunderstanding." The record does not support this contention. To the contrary, the jury prefaced its question with an acknowledgment that the prosecutor bore the burden of proof, indicating that the jury was well aware that it was required to determine whether the prosecution had proven the charged offenses beyond a reasonable doubt. Moreover, the court directed the jury that the answer to its question about the burden of proof would be found within the instructions that it had been given. Contrary to Rucker's argument, the record does not reveal confusion, a misunderstanding of the burden of proof, a court misinstructing the jury or endorsing jury confusion, a court failing to assist the jury in response to its question, or any actions that permitted a conviction without requiring the prosecutor to prove the elements of the offense beyond a reasonable doubt. Rucker has not shown an abuse of discretion here.

11

## IV. Cumulative Error

Rucker contends that even if the instructional errors presented above do not individually require reversal, their cumulative effect deprived him of a fair trial. As we have identified only one error, there is no showing of cumulative error here.

## V. Use of a Police Report to Establish Age for a Strike Prior

The prosecution alleged that Rucker had suffered a prior sustained juvenile adjudication for robbery in 1984. In order for this juvenile adjudication to be used as a strike prior to enhance Rucker's sentence, the prosecution was required to prove that Rucker was 16 years of age or older at the time of the offense. (Pen. Code, § 667, subd. (d)(3)(A).) Limited documentation was available to prove the details of the juvenile adjudication. The prosecutor presented evidence that Rucker had been committed to the California Youth Authority (CYA) on either February 16, 1984, or March 15, 1984, for robbery, but the documentation did not state the date of the offense. For the date of the offense, the prosecutor relied upon a police report from January 1984 in which Rucker had been arrested in conjunction with a robbery. Over defense objection, the court permitted the prosecutor to use the police report to prove the date of the offense.

The prosecution bears the burden of proving beyond a reasonable doubt all the elements of a sentence enhancement. (*People v. Miles* (2008) 43 Cal.4th 1074, 1082.) Rucker appeals the court's determination that the prosecutor proved this strike prior beyond a reasonable doubt. He argues that the police report was inadmissible hearsay; that the admission of the report into evidence violated his right to confrontation under *Crawford v. Washington* (2004) 541 U.S. 36; and that there was insufficient evidence to support the court's determination that he was 16 years old at the time of the juvenile offense. We agree with Rucker that the evidence was insufficient to establish that he was 16 years old at the time of the juvenile offense.

The evidence submitted by the prosecutor demonstrated that Rucker had a juvenile adjudication for robbery dating to February or March of 1984. One set of records, Exhibit 54, listed a case number, described the offenses as "211P.C.—Robbery/Un-Enhanced" and "496.1 PC Rec Stolen Property." This document listed a commitment date of "2-16-84" but did not state the date of the offense. The Division of Juvenile Justice stated in writing that this was the date of confinement but reported that the records relating to the case had been destroyed. Rucker's California Law Enforcement Telecommunications System (CLETS) printout listed him in CYA custody for robbery with a date of March 15, 1984.

The prosecutor could not establish the date of the offense from these records. To do that, she relied upon a police report showing that Rucker was arrested for robbery on January 10, 1984. The text of the report indicated that Rucker was arrested immediately after the robbery, and the prosecutor argued that the offense date was January 10, 1984. This police report was not a certified document from the record of conviction. (See Evid. Code, § 1280.) The police report was inadmissible hearsay offered to prove the facts recited in it, and no exception to the hearsay rule permitted the use of the report to establish the date of the robbery. Even if we were to conclude, as the People argue, that the public records exception to the hearsay rule permitted the introduction of the report, admitting the police report under that exception would permit the court only to consider the date of the report. (Evid. Code, § 1280 [public records exception makes admissible "[e]vidence of a writing made as a record of an act, condition or event"].) The remaining information in that report, such as the location of the offense, the date of the incident, the name of the suspect and other details about him, is further hearsay recounted within the police report; and, as double hearsay, would not be rendered admissible by the public records exception.

Not only was the police report not properly admitted, it did not establish the date of the offense for the robbery and receipt of stolen property offenses that were the subject of the alleged juvenile adjudication. While both the police report and the offense for which Rucker was committed to the CYA involved a robbery, the prosecution presented

13

no evidence that the police report described the same robbery for which Rucker was committed to the CYA later in 1984. The prosecutor argued that it was "the reasonable conclusion" that the date of the crime corresponding to the later adjudication was January 10, 1984, but a reasonable conclusion is not proof beyond a reasonable doubt. Moreover, drawing that conclusion required the court to consider inadmissible evidence, for no factfinder could reasonably conclude that the offenses were one and the same without relying on the double hearsay in the police report: the name of the suspect, the location of the offense, and the date of the incident. As the prosecution did not present admissible evidence from which the court could properly conclude that Rucker suffered a juvenile adjudication for robbery when he was 16 years of age or older, we conclude that the evidence was insufficient to support the court's finding that Rucker suffered a prior juvenile adjudication within the meaning of the Three Strikes Law (Pen. Code, §§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)). We reverse the finding on the strike prior and remand the matter to the trial court.

## VI.    Pitchess

Rucker requested in his opening brief that this court review the trial court's decisions at the in camera hearing on his motion under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531. Specifically, Rucker contends that the record does not make clear what records were turned over by the custodian of records of evaluated by the court, requiring remand or independent review of the records.

The trial court granted Rucker's motion for discovery of the personnel records of four police officers with respect to issues of false reporting and the removal of evidence during the time period from five years before the incident to December 31, 2010, and Rucker requests that we review these proceedings for any error. We have reviewed the sealed record of the proceedings. At the in camera proceedings the custodian of records testified under oath that she had brought all existing files regarding the four officers, regardless of the nature of the allegation and the time frame. The trial court described

thoroughly the documents produced by the custodian of records and reviewed by the court. We conclude the trial court appropriately exercised its discretion in determining that none of the documents were relevant to Rucker case and that no disclosure of material from the officers' personnel files was appropriate. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1229.)

## DISPOSITION

The finding that Rucker suffered a prior juvenile adjudication within the meaning of Penal Code sections 667, subdivisions (b)-(i) and 1170.12, subdivisions (a)-(d), is reversed for insufficient evidence. The matter is remanded to the trial court for further proceedings. The clerk of the superior court is then directed to prepare a corrected abstract of judgment and to forward a certified copy of the abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects the judgment is affirmed.

ZELON, J.

We concur:


PERLUSS, P. J.


WOODS, J.

15