Filed 10/15/21  P. v. Milian CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D078396 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SWF1807233) |
| RAFAEL GARCIA MILIAN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Kelly L. Hansen, Judge.  Affirmed as modified; remanded with directions.

Anthony J. Dain, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos, and Kathryn Kirschbaum, for Plaintiff and Respondent.

A jury convicted Rafael Garcia Milian of oral copulation with a minor 10 years old or younger (Pen. Code,[1] § 288.7, subd. (b); count 2); two counts of

---

[1]    Statutory references are to the Penal Code unless otherwise specified.

lewd touching of a minor under 14 years old by force or duress (§ 288, subd. (b)(1); counts 3 and 4); and simple domestic battery (§ 243, subd. (e); a lesser included offense of count 6). The jury acquitted Milian of attempted sexual intercourse with a minor 10 years old or younger (§§ 664 and 288.7, subd. (a); count 1); preventing or dissuading a witness from reporting a crime (§ 136.1, subd. (b)(1)); count 5); inflicting corporal injury on a fellow parent (§ 273.5, subd. (a)(1); count 6); and making a criminal threat (§ 422; count 7).

The court sentenced Milian to prison for 10 years plus 15 years to life, comprised of 15 years to life on count 2 plus a consecutive, upper sentence term of 10 years on count 3. The court also ordered a one-year term on count 6 to run concurrently with the other counts. Under section 654, the court stayed an upper term sentence of 10 years on count 4.

Milian appeals, arguing the court prejudicially erred in providing an incomplete character evidence jury instruction and the prosecution committed prejudicial error during closing argument. We reject these two contentions. Further, we conclude that Milian has not shown, on the record before us, that he received ineffective assistance of counsel. However, as the People concede, because of a change in the law, the booking fee Milian was ordered to pay under former Government Code section 29550.2 became unenforceable and uncollectible after July 1, 2021. As such, that portion of Milian's sentence shall be vacated. In all other respects, the judgment is affirmed.

## FACTUAL BACKGROUND

### Prosecution

Milian and Reynalda L. began a romantic relationship after meeting in 2012. Milian is the biological father of the youngest of Reynalda's three children, who was born in October 2014. Milian and Reynalda did not live

together, but they often spent time at each other's residences while they were dating. In 2016, Milian and Reynalda would frequently get into arguments, break up, and then get back together within a few days. During this time, when Reynalda's oldest daughter J.B. was about seven or eight years old, Milian would help her with her homework, but he was not affectionate with her. Reynalda's children had a regular babysitter; so, Milian was not responsible for watching them except when Reynalda was showering or there were no other adults around.

In March of 2018, Reynalda went to Colorado for a work trip, and her three children stayed with her sister, Itzel G. While she was staying with her aunt, J.B. told Itzel that Milian had kissed her on the lips. Later, J.B.'s other aunt, Anabel, heard about what Milian had done to J.B.; so, she talked to J.B. as well. J.B. told Anabel that she did not like Milian because "he used to touch her, and kiss her in the mouth, and touch her private parts . . ."

Toward the end of March, when Reynalda returned from her trip, Anabel sent her a text message about J.B. J.B., Reynalda, and Anabel then had a brief discussion that led to Anabel driving both J.B. and Reynalda to the police station.

At the police station, Reynalda reported the allegations of abuse to officers, including Investigator Gerald Franchville. Franchville then arranged for a social worker to conduct a forensic interview with J.B.

On April 2, 2018, social worker Denise Moore conducted a forensic interview with J.B., and a video recording of this interview was played for the jury. The next day, Franchville met with Reynalda again to try to conduct a pretext telephone call with Milian. Thus, Reynalda and Milian subsequently communicated through Snapchat's direct-message feature that day, which was how they frequently communicated. Franchville instructed Reynalda to

question Milian about some of the acts J.B. had disclosed the day before in her forensic interview and further asked her to downplay the incidents when communicating with Milian.

In the messages that followed, Reynalda told Milian that she was concerned because J.B. had mentioned that he had kissed her on her mouth. Milian responded, "I've always liked them as my daughter . . . but I shouldn't be doing those things, right? It's because I've always treated my daughters like that." Reynalda then asked, "I'm okay with that if you see her like your daughter. But why would you wait until I would go into the restroom?" Milian answered, "No, love, I thought it was something funny and I don't know, I jumped and I know that wasn't right. Sorry. I know I look bad."

Moments later, Reynalda and Milian talked on the phone, discussing meeting at a restaurant. One of the sheriff deputies told Reynalda to ask Milian about what had happened with J.B. When she did so, Milian said he did kiss J.B. on the mouth, but it was because he saw her as his daughter, and added that he maybe should not have done that.

On April 9, 2018, Moore conducted a second forensic interview with J.B., and a video recording of this second interview also was played for the jury.

In her forensic interviews and during her testimony at trial, J.B. said the first bad thing Milian did to her was when she was seven years old, she was watching a movie with him, and he kissed her on the mouth and touched her breasts. J.B. testified she wanted to tell her mother about it when it first happened, but she did not do so because Milian told her that if she did, he would hurt her mom or her family.

On another occasion when J.B. was still around seven years old, she was on the floor of her mother's room while her mother was taking a shower.

4

Milian came out of the bathroom with a towel on and no clothes underneath, got on top of her, and tried to put his penis in her vagina. In her first forensic interview, she said Milian spread her legs apart, tried to put his penis inside of her, but did not do so. She also said that Milian pulled her pants down, and she could not pull them up because Milian was "trapping" her with his legs. At trial, however, J.B. testified that she was wearing shorts at the time, and Milian never tried to take them off. She tried to get him off of her by putting her hands on his chest and pushing him away. Once she got Milian off of her, she ran to the living room and sat down on the couch. She also did not tell her mother about this incident because she was scared of Milian.

On another occasion while J.B.'s mother was in the shower, J.B. was in her bed when Milian kissed her and put his hand on her leg near her vagina. He did not actually put his hand on her vagina, but it nevertheless made her feel uncomfortable. J.B. testified that this kind of touching did not happen often, but some days she "already [knew] that he was ready to touch [her]." She testified that he would kiss her "a lot" on the lips and would do so when no one else was around.

On other occasions, Milian touched J.B.'s vagina over her clothes. He would do so in the living room, on the couch while watching television, or in Reynalda's bedroom while Reynalda was not present. J.B. would try to get Milian to stop by pushing him away. Sometimes he would stop, but other times he would stop and then start doing it again.

When J.B. was seven or eight years old, while J.B. was riding a horse with Milian at her grandmother's ranch in Fallbrook, Milian took J.B.'s right hand and put it inside his pants onto his penis. She was able to get her hand out of his pants, but he would not let her hand go. Eventually, J.B. was able to pull her hand away from Milian; however, to prevent herself from falling

5

off the horse, she put her hand on Milian's shoulder. Milian tried to grab her hand again, but she held on to the back of his shirt.

On another occasion, again when J.B. was seven or eight years old, she fell asleep in the back seat of Milian's car and her mother was asleep in the front seat. J.B. woke up and Milian was touching her vagina on top of the pants she was wearing. She turned away from him to stop it, but Milian then touched her butt before he stopped touching her.

In a different interaction, J.B., Milian, and Reynalda were all lying in bed together, and while Reynalda was sleeping, Milian forced his penis into J.B.'s mouth. J.B. pushed Milian away and he stopped after a second or two.[2]

Also, one time when Reynalda was not home, J.B. was on the couch with Milian and saw that he was watching "something nasty" on his phone. She saw a video of a boy and a girl kissing while naked in the shower.[3]

Defense

Milian testified in his defense. He denied all of the allegations and maintained that he never touched J.B. in a sexual manner. He acknowledged that during a pretextual communication with Reynalda, he said that he had

---

[2] During trial, J.B. could not recall all the details about this incident. However, during her first forensic interview, J.B. said she saw Milian pull his pants down, which she did not like so she got off the bed, but then she sat back on the bed. Milian was wearing something green on his penis, and Milian made her put her mouth on his penis for about five seconds. She said it felt like a "lollipop" in her mouth but that it was "in a weird shaped way."

[3] The jury also convicted Milian of simple domestic battery (§ 243, subd. (e)) for an instance when he pulled Reynalda's hair and dragged her away from a man with whom Reynalda was dancing. Because Milian does not appeal his conviction as to this offense, we do not discuss the crime in more detail.

6

kissed J.B. and that it was a "problem," but he insisted that Reynalda deleted the part of the conversation where he explained the full story. Milian testified that J.B. had actually been the one to kiss him and that based on the way she did so, J.B. also must have kissed other people besides him.

Milian also called Dr. Roberto Flores, a psychologist, who had been retained to psychologically evaluate him. Flores was asked to address whether Milian suffered from a psychiatric disorder and to evaluate whether Milian's background or profile indicated a propensity or inclination toward sexual deviance. He opined that Milian had no indication of a psychiatric history (no complaints or displays of mental disorders) and that his history was not consistent with an ongoing propensity or an inclination for sexual deviance against minors. He also conducted a "risk assessment" to determine the likelihood that Milian would reoffend and opined that Milian's risk of recidivism was low.

Milian also called one of his friends to testify on his behalf. That friend stated that he had been at the ranch in Fallbrook a couple times and had never seen any children riding horses there. He also testified that the saddle for the horses that Milian would ride are only made for one person, and it would be unsafe for another person, even a child, to ride in the saddle with another person.

DISCUSSION

I

MILIAN'S EXPERT WITNESS

A. Milian's Contentions

Milian argues the trial court prejudicially erred in instructing the jury to only consider Milian's good character for being at a low risk of reoffending, rather than his good character for a lack of propensity for committing sexual

7

offenses against children.  Milian also contends that the prosecutor committed misconduct during closing argument when he told the jury that the defense expert did not offer an opinion about Milian's proclivity toward the type of sexual offenses alleged in the instant action.

## B.  Background

Flores, Milian's expert witness, offered three primary opinions at trial. He opined that:  (1) Milian had no indication of a psychiatric history; (2) Milian's history was not consistent with an ongoing propensity or an inclination for sexual deviance against minors; and (3) Milian's risk of recidivism was low.  In reaching his opinion, Flores did not consider the charges against Milian in the instant matter.  Moreover, Flores admitted that he could not ascertain whether Milian was telling the truth when he provided him with his "history."

On cross-examination, the prosecutor clarified that Flores did not conduct any sort of assessment to gauge Milian's sexual attraction to children, even though such assessments could have been given.  The prosecutor probed the basis for Flores's opinions and eventually asked Flores, "You are making no judgment about [Milian's] attraction or possible attraction to children; correct?"  Flores replied, "On the basis of the history I'm working with, again, aside from this particular case, the history is not consistent with his having that attraction."  Flores was clear that he had no opinion about whether Milian committed the offenses against J.B.

On redirect examination, Flores testified that his opinion that Milian had "no propensity for attraction to minors" was based on what Milian reported and "the history conveyed in the records reviewed."  Based on those sources, in Flores's opinion, there was no indication that Milian was sexually

8

attracted to children. But in reaching this opinion, Flores stated he "put the charges and allegations in this particular case aside."

Among other instructions, Milian's trial counsel requested CALCRIM No. 350 (Character of Defendant).[4] Subsequently, during the jury instruction conference, the trial court indicated that it would give CALCRIM No. 350 on the "character of the defendant." Defense counsel did not object to the proposed language of CALCRIM No. 350 as given, and he did not request any additional language during the conference. The court asked counsel if there were any defense proposed instructions that the court did not include. Counsel responded in the negative.

---

[4] CALCRIM No. 350 provides:

> "You have heard character testimony that the defendant (is a *<insert character trait relevant to crime[s] committed>* person/ [or] has a good reputation for *<insert character trait relevant to crime[s] committed>* in the community where (he/she) lives or works).

> "Evidence of the defendant's character for *<insert character trait relevant to crime[s] committed>* can by itself create a reasonable doubt [whether the defendant committed <insert name[s] of alleged offenses[s] and count[s], e.g., battery, as charged in Count 1>]. However, evidence of the defendant's good character may be countered by evidence of (his/her) bad character for the same trait. You must decide the meaning and importance of the character evidence.

> "[If the defendant's character for certain traits has not been discussed among those who know (him/her), you may assume that (his/her) character for those traits is good.]

> "You may take that testimony into consideration along with all the other evidence in deciding whether the People have proved that the defendant is guilty beyond a reasonable doubt."

Regarding the character evidence instruction, the court later instructed the jury:

> "You have heard character evidence that the defendant has a low risk for committing sexual crimes against children in the future.
>
> "Evidence of the defendant's character for low risk for committing sexual crimes against children in the future can by itself create a reasonable doubt. However, evidence of the defendant's good character may be countered by evidence of his bad character for the same trait. You must decide the meaning and importance of the character evidence."

During defense counsel's closing argument, counsel argued to the jury that it had heard Flores's opinion that Milian had "no real proclivity to be with small children." Later, counsel reiterated the purpose of calling Flores: "And of course[,] we had Dr. Flores come in and talk about his recidivism, and his proclivity for being with small children, and it just didn't happen—or wouldn't happen."

During the prosecutor's rebuttal argument, the prosecutor addressed Flores's testimony:

> "You heard a doctor who made absolutely no claim, and repeated it over and over that he makes absolutely no opinion with regard to the facts of this case or if the defendant was dispossessed to attraction to children. His testimony was that this is towards recidivism in the future. And even for his calculation, he has to assume that the charges are true. He never told you that the defendant doesn't have a proclivity for that."

Milian's trial counsel did not object to this portion of the prosecutor's rebuttal closing argument.

10

C. Jury Instruction Challenge

Milian argues the CALCRIM No. 350 instruction was erroneous because Flores's testimony was not limited to simply opining that Milian was not inclined to commit sexual crimes against children in the future, but he did not have a propensity or inclination for sexual deviance against children. Put differently, Milian argues the character evidence instruction was incomplete. He does not contend that jury instruction was an incorrect statement of law. "A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language." (*People v. Lang* (1989) 49 Cal.3d 991, 1024; accord, *People v. Livingston* (2012) 53 Cal.4th 1145, 1166; *People v. Lewis* (2001) 26 Cal.4th 334, 380.) Accordingly, the claim is forfeited.

Moreover, even if we did not find this challenge forfeited, we would determine the court did not err in giving the instruction. In criminal cases " '[a] trial court has a duty to instruct the jury "sua sponte on general principles which are closely and openly connected with the facts before the court." ' " (*People v. Gutierrez* (2009) 45 Cal.4th 789, 824; see *People v. Breverman* (1998) 19 Cal.4th 142, 154.) However, the court " 'need not instruct on specific points or special theories which might be applicable to a particular case, absent a request for such an instruction.' " (*People v. Garvin* (2003) 110 Cal.App.4th 484, 488-489.) Such instructions, which are known as pinpoint instructions, " 'relate particular facts to a legal issue in the case or "pinpoint" the crux of a defendant's case' " and are not required to be given sua sponte. (*People v. Rogers* (2006) 39 Cal.4th 826, 878.) In reviewing a claim that the court's instructions were incorrect or misleading, we inquire as to whether there is a reasonable likelihood the jury understood the

11

instructions as asserted by the defendant. (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1332.) In so doing, "[w]e consider the instructions as a whole and assume the jurors are intelligent persons capable of understanding and correlating all the instructions." (*Ibid.*)

On the record here, we find no instructional error. The trial court instructed the jury under CALCRIM No. 350 as Milian requested for a jury instruction on character evidence; it had no further duty to sua sponte provide the precise language Milian now agues should have been given.[5] Further, as given, the character evidence instruction did not limit or preclude the jury from considering the totality of Flores's testimony; nor did it limit the jury's ability to give weight to his opinion that Milian did not have a propensity for sexual attraction to children. To this end, the jury was given a separate jury instruction on expert opinion evidence, CALCRIM No. 332, which provided:

> "A witness was allowed to testify as an expert and to give an opinion. You must consider the opinion, but you are not required to accept it as true or correct. The meaning and importance of any opinion are for you to decide. In evaluating the believability of an expert witness, follow the instructions about believability of witnesses generally. In addition, consider the expert's knowledge, skill, experience, training, and education, the reasons the expert gave for any opinion, and the facts or information on which the expert relied in reaching that opinion. You must decide whether

---

[5] As the People observe, Milian points this court to a couple cases (*People v. Guerra* (2006) 37 Cal.4th 1067 and *People v. McAlpin* (1991) 53 Cal.3d 1289) for the proposition that the trial court here had a sua sponte obligation to include additional language in CALCRIM No. 350 regarding Flores's opinion that Milian did not have a propensity for sexual deviance with children. However, these two cases discuss what a defendant is permitted to introduce to show a lack of propensity. Neither case addresses the jury instruction issue present in the instant action.

12

> information on which the expert relied was true and accurate.
>
> "You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence."

No portion of CALCRIM No. 350 instructed the jury to disregard Flores's testimony or limit its consideration of that testimony in any way. In short, there was no instructional error.

### D. Prosecutorial Misconduct

"It is well settled that making a timely and specific objection at trial, and requesting the jury be admonished (if jury is not waived), is a necessary prerequisite to preserve a claim of prosecutorial misconduct on appeal." (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1328 (*Seumanu*).) "The primary purpose of the requirement that a defendant object at trial to argument constituting prosecutorial misconduct is to give the trial court an opportunity, through admonition of the jury, to correct any error and mitigate any prejudice." (*People v. Williams* (1997) 16 Cal.4th 153, 254.) "When a defendant believes the prosecutor has made remarks constituting misconduct during argument, he or she is obliged to call them to the court's attention by a timely objection. Otherwise no claim is preserved for appeal." (*People v. Morales* (2001) 25 Cal.4th 34, 43-44.) However, the failure to object or ask for an admonition will be excused if either act would have been futile. (*People v. Fayed* (2020) 9 Cal.5th 147, 204.)

Milian does not contest that his trial counsel neither objected to the prosecutor's statements nor asked the trial court to admonish the jury about those statements. Moreover, he does not claim that any objection and/or request for admonition would have been futile. Therefore, Milian has forfeited his prosecutorial misconduct claim. (*Seumanu, supra,* 61 Cal.4th at p. 1328.)

E. Ineffective Assistance of Counsel

Milian contends that if we find forfeiture as to the jury instruction issue or the claim of prosecutorial misconduct then he received ineffective assistance of counsel. To establish ineffective assistance of counsel, a defendant must "demonstrate (1) counsel's performance was deficient in that it fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient representation prejudiced the defendant, i.e., there is a 'reasonable probability' that, but for counsel's failings, defendant would have obtained a more favorable result." (*People v. Dennis* (1998) 17 Cal.4th 468, 540-541; see *Strickland v. Washington* (1984) 466 U.S. 668, 687.)

Where a defendant argues on appeal that counsel's failure to raise a timely objection at trial amounts to ineffective assistance of counsel, "a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) Moreover, " '[u]nless a defendant establishes the contrary, we shall presume that "counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." [Citation.] If the record "sheds no light on why counsel acted or failed to act in the manner challenged," an appellate claim of ineffective assistance of counsel must be rejected "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation." ' " (*People v. Bell* (2019) 7 Cal.5th 70, 125; see *People v. Nguyen* (2015) 61 Cal.4th 1015, 1051 [" 'In the usual case, where counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on

appeal unless there could be no conceivable reason for counsel's acts or omissions.' "].)

Here, Milian's ineffective assistance argument rests on his assertion that his trial counsel had no tactical reason for failing: (1) to request "an appropriate instruction based upon Dr. Flores'[s] testimony" and (2) to object to the prosecutor's misstatements during rebuttal closing argument. We reject these contentions.

As to the jury instruction issue, the record is inadequate for us to evaluate the ineffective assistance of counsel claim. Defense counsel recommended CALCRIM No. 350. We are not sure the precise language he requested, but we know how the court instructed the jury, which was consistent with the only written copy of the jury instructions in the record. That instruction focused on Flores's opinion that Milian was at a low risk to commit a sexual crime against children in the future. Because Milian's trial counsel did not object to the CALCRIM No. 350 instruction given, a logical inference is that the court gave the instruction provided by defense counsel. Milian argues there was no strategic reason for the character evidence jury instruction to focus only on one of Flores's opinions. We disagree.

During the trial, Flores clearly stated that, in forming his opinions, he did not consider the charges against Milian in the instant matter. And based on the information provided to him by Milian, Flores opined that Milian did not have a proclivity for sexual deviance toward children. However, he did not conduct any tests or examinations to reach this opinion. Instead, he merely relied on what information Milian provided about himself, and he admitted that he could not "attest to Mr. Milian's veracity in giving [him] that history." In other words, Flores conceded at trial that he simply accepted what Milian told him about his history as true.

15

In contrast, in determining that Milian exhibited a low risk for committing sexual crimes in the future, Flores conducted a "risk assessment" to evaluate Milian. During cross-examination, Flores suggested that he used the Sex Offender Risk Appraisal Guide to conclude Milian was at a low recidivism risk.

Therefore, based on Flores's testimony at trial, it could have been that Milian's counsel wanted the jury to focus on what he believed to be the stronger opinion of Flores. And because Flores's opinion that Milian was at a low risk to commit a sexual crime in the future was based on a risk assessment and not merely what information Milian provided, defense counsel could have made the reasonable, strategic decision to emphasize that opinion when the jury considered the character evidence offered at trial. As such, he would have wanted to be very specific in the CALCRIM No. 350 instruction provided in the jury. Thus, on the record before us, we cannot determine that Milian's trial counsel was ineffective based on the character evidence jury instruction given. (See *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266 [" ' "[If] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal must be rejected.' [Citation.]"].)

In addition, Milian's ineffective assistance of counsel claim is no more successful when we consider his trial counsel's failure to object to a portion of the rebuttal closing argument where the prosecutor discussed Flores's opinions. As a threshold matter, we observe that the prosecutor's rebuttal argument was not a model of clarity. He stated Flores had "absolutely no opinion with regard to the facts of this case or if the defendant was

16

dispossessed to attraction to children." The phrase "dispossessed to attraction to children" is almost nonsensical. Certainly, it is much less clear than defense counsel's clear argument during closing that Flores testified that Milian had "no real proclivity to be with small children."

Further, the prosecutor later explained during his rebuttal closing argument that Flores "never told you that the defendant doesn't have a proclivity for that." From the context of this portion of the rebuttal closing argument, it appears the "that" to which the prosecutor is referring might be an attraction to or sexual deviance toward children. Certainly, the prosecutor could have been much more lucid in making this portion of his rebuttal closing argument. Given the confusing nature of the prosecutor's closing, defense "counsel may have desired not to highlight the evidence by making an objection." (*Seumanu, supra*, 61 Cal.4th at p. 1313; see *People v. Catlin* (2001) 26 Cal.4th 81, 165 ["the decision whether to object, move to strike, or seek admonition regarding [undesired] testimony is highly tactical, and depends upon counsel's evaluation of the gravity of the problem and whether objection or other responses would serve only to highlight the undesirable testimony"].) Indeed, Milian's trial counsel might have thought the best strategy was to refrain from objecting to the prosecutor's somewhat confusing closing argument as opposed to objecting to it and asking for an admonition. If he had objected and the court admonished the jury, then the prosecutor could have focused more effectively on Flores's subject opinion and underscored the fact that Flores simply accepted what Milian said as true, ignored the charges in the instant matter, and did not employ any tests to determine Milian did not have a proclivity toward sexual deviance with children. Put differently, the prosecutor could have argued to the jury that

Flores's opinion was no more than a regurgitation of what Milian told him. Thus, Milian's ineffective assistance claim fails for this reason as well.

## II

## THE BOOKING FEE

Milian also asks us to direct the trial court to vacate the $514 booking fee the court imposed under former Government Code section 29550.

In 2020, the Legislature passed Assembly Bill No. 1869 (2019-2020 Reg. Sess.) (Assem. Bill 1869) to "eliminate the range of administrative fees that agencies and courts are authorized to impose to fund elements of the criminal legal system." (Assem. Bill 1869, § 2, eff. Sept. 18, 2020, operative July 1, 2021.) Among other provisions, Assem. Bill 1869 added Government Code section 6111. (Assem. Bill 1869, § 11.) Government Code section 6111 became effective on July 1, 2021. It provides that "the unpaid balance of any court-imposed costs pursuant to Section 27712, subdivision (c) or (f) of Section 29550, and Sections 29550.1, 29550.2, and 29550.3, as those sections read on June 30, 2021, is unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated." (Gov. Code, § 6111, subd. (a).)

In his opening brief on appeal, filed before July 1, Milian asserted Assem. Bill 1869 should be applied retroactively to vacate the booking fee in this case. However, while the appeal was pending, Government Code section 6111 became effective. Pursuant to the plain language of the newly enacted statute, the unpaid balance of the criminal justice administration fee is unenforceable and uncollectible, and the portion of the judgment imposing such costs must be vacated. (Gov. Code, § 6111, subd. (a).)

We do not agree with the People's contention that affirmance of the judgment is appropriate on the ground that Milian will receive automatic

18

relief from collection of the unpaid portion of the fee that remains as of July 1, 2021. Although no further collection of any unpaid portion of the fee may occur as of July 1, 2021, pursuant to the express terms of Government Code section 6111, subdivision (a), Milian is entitled to the vacatur of that portion of the criminal justice administration fee imposed pursuant to former Government Code section 29550 that remains unpaid as of July 1, 2021, and to the modification of his judgment consistent with such vacatur. Government Code section 6111, subdivision (a) provides not only that any costs imposed pursuant to the listed statutory provisions that remain unpaid on and after July 1, 2021 are "unenforceable and uncollectible," but also that "any portion of a judgment imposing those costs shall be vacated." (Gov. Code, § 6111, subd. (a).) Thus, by its express terms, Government Code section 6111 envisions that the referenced costs are to be vacated, and it makes the vacatur mandatory through its use of the word "shall." (See, e.g., *Mostafavi Law Group, APC v. Larry Rabineau, APC* (2021) 61 Cal.App.5th 614, 622 [noting that courts generally construe the word "shall" as mandatory].) Although Government Code section 6111's reference to "those costs" is ambiguous, in that "those costs" could refer to the entirety of the fee imposed by the trial court, such that the vacating of "those costs" would eliminate the fee in its entirety, we conclude that the statutory scheme supports interpreting the phrase "those costs" as referring only to that portion of fee imposed by the court that remains unpaid as of July 1, 2021. (See Assem. Bill 1869, § 2 [intent of the Legislature is to "eliminate all outstanding debt incurred as a result of the imposition of administrative fees"].)[6] We therefore vacate any balance of the costs imposed by the court

---

[6]     Milian appears to concede that he is entitled to vacatur of only that portion of the former Government Code section 29550 fee that remains

19

pursuant to former Government Code section 29550 that remains unpaid as of July 1, 2021.

## DISPOSITION

Any portion of the $514 booking fee imposed under former Government Code section 29550 unpaid as of July 1, 2021 is vacated.  The judgment is affirmed as so modified.

The matter is remanded to the trial court with directions to amend the abstract of judgment to reflect the vacatur of any balance of the fee imposed pursuant to former Government Code section 29550 that remains unpaid as of July 1, 2021.  The court shall forward a copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.


HUFFMAN, Acting P. J.

WE CONCUR:


O'ROURKE, J.


DO, J.

---

unpaid as of July 1, 2021, in that he requests that this court "direct the trial court to vacate any portion of any judgment ordering collection of any unpaid debt related to this fee."

20